EAGLE MORTGAGE CORP. ET AL *v.* J. L. JOHNSON
ET AL

5-4533 427 S. W. 2d 550

Opinion delivered May 6, 1968

*Hall & Tucker* and *Fred E. Briner,* for appellants.

*Butler & Dishongh,* for appellees.

CARLETON HARRIS, Chief Justice. The appellees herein are all owners of property in Hollywood Heights Subdivision, Saline County, Arkansas. On November 13, 1962, one of the appellants, Land Development, Inc., being the sole owner of a 120-acre tract of land in Saline County, executed and recorded a plat and Bill of Assurance, carving the land into streets, a proposed park, and 248 lots. Various restrictions were listed in the bill of assurance on the use of, and improvements to, the property. The issue in this litigation arises because of the provisions of Paragraph 7 and Paragraph 12 of the bill.

Paragraph 7 provides:

"Temporary structure. No structure of a temporary character, trailer, basement, tent or shack, garage, barn, or other out building other than servant's quarters, shall be erected on a building site covered by these covenants for human habitation, temporarily or permanently, nor shall any temporary type residence be erected thereon for human habitation."

Paragraph 12 provides:

"The AMENDMENTS. Any and all of the covenants, provisions, or restrictions set forth in this Bill of Assurance may be amended, modified, extended, changed, or cancelled, in whole or in part by a written instrument signed and acknowledged by the owner or owners of at least 50% in the area of the land in this subdivision, and the provisions of such instrument so executed shall be binding from and after the date it is duly filed for record in Saline County, Arkansas, and these covenants, restrictions, and provisions of this instrument shall be deemed covenants running with the land and shall remain in full force and effect unless and until amended or cancelled as authorized hereinabove."

Land Development, Inc., sold these 33 appellees (16 couples and 1 individual) lots in the subdivision,[1] the contracts of sale containing the following provision:

"In addition to the foregoing restrictions and stipulations, no dwelling shall be constructed on any lot purchased under this contract, nor shall any dwelling of less than 1,000 sq. ft. of floor space, excepting porches and porticos. There shall be no shed roofs and all buildings will be finished and painted on the outside. No houses will be moved in (or house trailers) on said property.

"The foregoing stipulations, restrictions and condi-

---

[1] Five have built homes.

tions are imposed for the benefit of each and every other parcel of land in this addition, and shall constitute covenants running with the land; and the vendor, its successors and assigns, and any person owning property in said addition may prosecute proceedings at law or in equity to prevent or remedy the violation of such restrictions and covenants, and secure redress for damages on account of such violation."

Subsequently, Land Development, Inc., conveyed its interest in Hollywood Heights to Eagle Mortgage Corporation (hereafter called Eagle) and Western Realty, Inc. (hereafter called Western). At the time of trial Eagle owned approximately 75 lots, of which 59 were subject to contracts of sale, and Western owned 130 lots, of which 2 were subject to contracts of sale. All of the lots owned by Western are encumbered by a mortgage to Eagle.

Accordingly, on March 20, 1967, Western and Eagle were the owners of more than 50% of the area of land in this subdivision, and on that date, they executed an amended bill of assurance for Hollywood Heights Subdivision, which was filed for record on March 21, 1967. This amendment to the 1962 bill permitted mobile homes in an undeveloped portion, and very close to the center, inclusive of Lots 171 through 190, of the original subdivision; these lots were replatted into "Western Park Subdivision," mobile homes in this new subdivision being permitted. Appellants sold some of the lots in Western Park for this type home, and were in the process of selling other lots, when the appellees instituted suit to enjoin them from making these sales on the ground that Paragraph 7 of the original bill was being violated. After the filing of answers, appellants contending their action was authorized by Paragraph 12, and the taking of interrogatories, the case proceeded to trial; at the conclusion thereof, the court held that Paragraph 12 of the original bill of assurance "constitutes abuse of law and is ambiguous and against public policy. That said

Paragraph 12 should be interpreted to read that the bill of assurance could be changed at such time that fifty per cent (50%) of the homeowners physically living in the subdivision vote to change the provisions.'' Appellants were enjoined from selling property for the purpose of placing house trailers or mobile homes in the subdivision, and the court further directed that all trailers previously placed thereon should be removed; the amended bill of assurance was voided. From the decree so entered, appellants bring this appeal.

Junior L. Johnson, one of the appellees, testified that he had owned one of the lots since January, 1965, and had just completed building a house. He valued his house and lot at approximately $15,000.00. Johnson had purchased two lots from Land Development, Inc., and he testified that he was aware of the restrictions in the contract, though he did not read the bill of assurance. The witness said that, upon inquiring if the same restrictions held true to the other lots in Hollywood Heights, he was assured by Charlie Miller, President of Land Development, Inc., that this was correct. Johnson stated that he was familiar with the provision in his deed, heretofore set out, and because of that provision, and the assurance by Miller, purchased the property. The parties stipulated that the testimony of this witness would be representative of the other appellees, except as to the value of their respective properties.

George F. Fleischauer, salesman and property manager of Block Realty Company, testified that he had not been in Hollywood Heights Subdivision, but that he had had experience with trailers being placed on property. He was of the opinion that lots that had been set up as a residential subdivision would be depreciated by as much as 50% if the trailers were then put in the center (of the subdivision). This statement had reference to ground value, and the witness stated that if homes were placed on the property, such improvements would be depreciated by 25% if trailers were moved in.

Miller testified that, in addition to Hollywood Heights, he had developed about 7 other subdivisions, all with similar bills of assurance. The witness said that he and his salesmen, in selling lots, would give prospective purchasers a brief resume of the restrictions, and that these restrictions were placed in the contracts so that the individual who purchased his lot would know exactly what he could do. He testified that the provision for amending a bill of assurance (referring to Section 12) is customary, and that the power to amend is essential:

"* * * You want to protect everyone as near as possible. At the same time you have to leave an opening somewhere because nobody knows what the future holds and if the majority of the land owners so desire to change it for some other purpose, I believe it would be a standard practice. I have never seen any that wasn't. * * * Any man, owner or owners who own 50% of the land or more would have the right to change the Bill of Assurance."

The witness said that at the time the bill was amended, there were only about 13 houses in the entire area, and that about 96% of the subdivision was uninhabited. He stated that a 6-foot redwood fence was being built surrounding the mobile home area.

Maurice Mitchell, Chairman of the Board of Eagle Mortgage Corporation and Vice-President of Western Realty, testified that, after examining the bill of assurance, his company made a development loan to Miller in the amount of $60,000.00 and subsequently provided additional investment. The sale of lots came to a halt, and Miller, unable to meet his obligations to the mortgagee, executed a deed to the property. According to Mitchell, the subdivision contained 248 lots and only 7 had been improved (other than mobile homes). Under the provisions of Section 12, Eagle and Western, being the owners of more than 50% of the lots, replatted a portion of the

area to permit the location of mobile homes. The witness referred to a number of subdivisions which Eagle had developed, and he said that language similar to Paragraph 12 was contained in every modern bill of assurance that he had ever seen. Mitchell held the view that the development of the mobile home area would increase the market value of the other lots by encouraging activity in the area. He said that no permanent dwelling would be erected next door or across the street from any mobile home.

C. V. Barnes, a real estate counselor of Little Rock, testified that all of the developments, with which he had been associated, had included a provision similar to Section 12, and he was actually of the opinion that the sale of mobile homes would aid in stabilization of the neighborhood. James Larrison, a professional appraiser of Little Rock, agreed with Mr. Barnes.

The sole question presented to us is the meaning of Paragraph 12, or to be more specific, that portion of the language which provides that the bill of assurance may be amended by a written instrument "signed and acknowledged by the owner or owners of at least 50% in the area of the land in this subdivision." The court held that this language was ambiguous, and constituted an abuse of law; that it should be interpreted to read that the bill could be changed "at such time that fifty per cent (50%) of the homeowners physically living in the subdivision vote to change the provisions."

Appellants simply contend that the meaning is that the owners of 50% of the land in the subdivision can amend the bill.

We are of the opinion that a provision in a bill of assurance giving the power to subsequently amend or modify the provisions of the original bill, is valid. In *Matthews* v. *Kernewood*, 40 A. 2d 522, the Maryland Court of Appeals held that one who conveys part of a

tract of land by deed containing restrictive covenants may reserve to himself the power to modify those restrictions in future sales. The same conclusion was reached by the Supreme Court of Georgia in the case of *Davis* v. *Miller*, 96 S. E. 2d 498.

Here, Paragraph 12 gave notice that the restrictions set forth in the bill could be amended or cancelled in whole or in part.

Appellees' principal argument is that the paragraph under discussion is ambiguous, and that the provision in question should be construed most strongly against the one who created it. We agree with that declaration of the law, but we do not agree that Paragraph 12 is so ambiguous as to be susceptible to two meanings. To be sure, the pertinent phrase is not perfectly written, but we think the language obviously means that the bill may be changed by "the owner or owners of at least 50% *of* the area of the land in this subdivision," rather than "*in* the area of the land," etc. The contrary construction, as pointed out by appellants, is not very logical. Appellants say:

"A reverse construction, 'by 50% of the *owner* or owners in the area of the land in this subdivision' simply does not make sense. There is no such thing as 50% of an owner, in this context."

Of course, the interpretation rendered by the court, viz., the "Bill of Assurance could be changed at such time that fifty per cent (50%) *of the homeowners physically living in the subdivision* [our emphasis] vote to change the provisions," is not supported by any language in the bill; nor do we find any evidence that would imply such a construction. In fact, this version could well lead to a preposterous situation. The proof reflected that, at the most, thirteen people had built homes in the entire area.[2] It would appear that, under the finding of

---

[2] Other evidence indicated that only seven had built homes.

the Chancellor, seven homeowners could change the bill of assurance for the entire subdivision composed of 248 lots. To go a step further, let us suppose that only two people had built homes in the original subdivision; again, according to the holding of the trial court, one homeowner could likewise change the bill of assurance for the whole subdivision. We think it evident that the questioned provision simply means that the bill may be modified by a written instrument executed by the owner or owners of 50% of the land in the subdivision.

Certainly, we can understand the position of the appellees, and the desire of those who have built their homes, to maintain the original restrictions; however, Paragraph 12 was a part of the bill of assurance when the lots were purchased, and therefore, all lot purchasers were on notice that the restrictions could be modified, or cancelled, in whole or in part.

Reversed.

BYRD, J., disqualified.